## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VALERIE R. WHITE, *et al.*,                )
                                           )
                         Plaintiffs,       )
                                           )
            vs.                            )       Case No. 16-CV-856 (CKK)
                                           )
HILTON HOTELS RETIREMENT PLAN,             )
*et al.*,                                  )
                                           )
                         Defendants.       )
_____   )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## SECOND RENEWED MOTION FOR CLASS CERTIFICATION

Stephen R. Bruce (DC Bar #289066)
Allison C. Pienta (DC Bar #494372)
1667 K St. NW, Suite 410
Washington, DC 20006-1583
202-289-1117
stephen.bruce@prodigy.net
acaalim@verizon.net

Attorneys for Plaintiffs and Plaintiff Class

**Table of Contents**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

The Named Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.      This Action Satisfies the Rule 23(a) Requirements for Numerosity,
        Commonality, Typicality, and Adequate Representation.. . . . . . . . . . . . . . . . . .  11

        A.      Defendants Do Not Contest that the Members of the Proposed Class Are
                So Numerous that Joinder Is Impracticable . . . . . . . . . . . . . . . . . . . . . . . .  12

        B.      Plaintiffs' Claims Present Common Questions of Law and Fact.. . . . . . . .  13

                1.      Valerie White's Subclass Has Common Issues.. . . . . . . . . . . . . . .  15

                2.      Eva Juneau's Subclass Has Common Issues.. . . . . . . . . . . . . . . .  18

                3.      Peter Betancourt's Subclass Has Common Issues.. . . . . . . . . . . .  28

        C.      The Named Plaintiffs' Claims Are Typical.. . . . . . . . . . . . . . . . . . . . . . . .  31

        D.      Defendants Do Not Contest That the Named Plaintiffs Will Fairly and
                Adequately Protect the Interests of the Class.. . . . . . . . . . . . . . . . . . . . . .  37

II.     The Proposed Class Should Be Certified Under Rule 23(b)(2).. . . . . . . . . . . . .  38

III.    Plaintiffs' Counsel Should be Appointed Class Counsel.. . . . . . . . . . . . . . . . . .  41

IV.     The Class Definition and Description of Class Claims Satisfy the Requirements
        of FRCP 23(c)(1)(B).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

# Table of Authorities

## Cases

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997)..................................................... 1

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455 (2013).. 11-12

*Arias v. Marriott International, Inc.*, 324 F.R.D. 307 (D.D.C. 2018)................... 15

*Barnes v. District of Columbia*, 242 F.R.D. 113 (D.D.C. 2007)......... 13-14, 32, 41

*Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018). ........................... 23

*Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512 (1972). ...................................... 22

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019). ........................ 14

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015)................................................. 42

*Campbell v. Nat'l R.R. Passenger Corp.*, 311 F.Supp.3d 281 (D.D.C. 2014). ....... 2

*Cannon v. University of Chicago*, 441 U.S. 677 (1979)........................................ 22

*Cigna Corp. v. Amara*, 563 U.S. 421 (2011)......................................................... 39

*Contilli v. Local 705 International Brotherhood of Teamsters Pension Fund*,
    559 F.3d 720 (7th Cir. 2009). ........................................................................ 30

*D.L. v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013)................... 12, 14, 34

*Daskalea v. Wash. Humane Society*, 275 F.R.D. 346 (D.D.C. 2011). .................. 11

*Disability Rights Council v. Washington Metropolitan Area Transit Authority*,
    239 F.R.D. 9 (D.D.C. 2006).............................................................................. 32

*Falk v. Brennan*, 414 U.S. 190 (1973). ................................................................. 22

*Hanson v. Hoffman*, 628 F.2d 42 (D.C. Cir. 1980). .............................................. 23

*Harris v. Medical Transport Mgmt.*, 300 F.Supp.3d 234 (D.D.C. 2018).............. 23

*Healthy Futures of Texas v. Dep't of Health and Human Services*, 326 F.R.D. 1
    (D.D.C. 2018). ............................................................................ 31

*Holt v. Winpisinger*, 811 F.2d 1532 (D.C. Cir. 1987). .............................. 12, 20, 23

*Hoyte v. D.C.*, 325 F.R.D. 485 (D.D.C. 2017). ................................................. 32, 37

*Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S.Ct. 768 (2020). .......................... 35

*Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718 (D.C. Cir. 2012). ... 4, 35, 39

*Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174
    (D.D.C. 1999). .......................................................... 3, 14, 32, 38-39

*Kifafi v. Hilton Hotels Retirement Plan*, 228 F.R.D. 382
    (D.D.C. 2005). .................................................................. 3-4, 15, 39

*Kifafi v. Hilton Hotels Retirement Plan*, 616 F.Supp.2d 7 (D.D.C. 2009). 15, 20, 25

*Kifafi v. Hilton Hotels Retirement Plan*, 736 F.Supp.2d 64 (D.D.C. 2010). ... 15, 39

*Kifafi v. Hilton Hotels Retirement Plan*, 999 F.Supp.2d 88 (D.D.C. 2013). .......... 38

*In re McCormick & Co.*, 2019 U.S. Dist. LEXIS 114583, 2019 WL 3021245
    (D.D.C. 7/10/2019). ...................................................................... 32

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293
    (D.D.C. 2007). ................................................................ 13, 34, 36

*Melendez v. Poy Loung DC Grp, LLC*, 2018 U.S. Dist. LEXIS 165996,
    2018 WL 4637007 (D.D.C. 9/27/18). ................................................ 20

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012). ........... 2

*Morrison v. Int'l Programs Consortium*, 253 F.3d 5 (D.C. Cir. 2001). ........... 22-23

*Moore v. Napolitano*, 926 F.Supp.2d 8 (D.D.C. 2013). ........................................ 14

*Nio v. United States Department of Homeland Sec.*, 323 F.R.D. 28

(D.D.C. 2017). ...................................................................................... 39

*O.A. v. Trump*, 404 F.Supp.3d 109 (D.D.C. 2019)......................................... 31, 34

*In re Rail Freight Fuel Surcharge Antitrust Litigation*, 287 F.R.D. 1
(D.D.C. 2012). .................................................................................... 42

*Taylor v. D.C. Water & Sewer Authority*, 241 F.R.D. 33 (D.D.C. 2007)............. 12

*Twelve John Does v. District of Columbia*, 117 F.3d 571 (D.D.C. 1997)............ 37

*Ventura v. Bebo Foods, Inc.*, 738 F.Supp. 1 (D.D.C. 2010)................................ 23

*In re Vitamins Antitrust Litigation*, 209 F.R.D. 251 (D.D.C. 2002)..................... 40

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).................................... 11, 14

*Walton v. Cotton*, 60 U.S. 355 (1857). ................................................... 37

*White v. Hilton Hotels Retirement Plan*, 263 F.Supp.3d 8 (D.D.C. 2017)........ 5, 10

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012). ..................... 42

## Statutes and Regulations

ERISA §3(5), 29 U.S.C. §1002(5). ........................................................ 20

ERISA §203, 29 U.S.C. §1053.................................................... 7, 20, 23

ERISA §502(a)(3), 29 U.S.C. §1132(a)(3)........................................... 30

FLSA §3(d), 29 U.S.C. §203................................................................ 22

26 C.F.R. 1.410(a)-7....................................................................... 16-17

29 C.F.R. 2530.200b-3. ................................................................ 16, 25

29 C.F.R. 2560.503-1(b)(5). ................................................................ 25

41 Fed. Reg. 56462 (1976). ................................................................ 16

FRCP 15(a). .................................................................................. 5, 11

FRCP 23(a). .................................................................................... *passim*

FRCP 23(b), (c), and (g). ............................................................ 39-42

## Miscellaneous

*Managing Class Action Litigation: A Pocket Guide for Judges* (2005). ................. 1

*Manual for Complex Litig., Fourth Edition*. ............................................ 13, 33, 42

**Introduction**

Pursuant to Local Civ. R. 23.1(c) and FRCP 23, Plaintiffs renew their motion to certify the proposed class and appoint the undersigned as Class counsel with Valerie R. White, Eva Juneau, and Peter Betancourt as class representatives. Class actions "permit the fair and efficient resolution of legitimate claims of numerous parties ... that might otherwise evade legal enforcement." *Managing Class Action Litigation: A Pocket Guide for Judges* (FJC 2005), at 1; *see, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997) (class actions provide a mechanism for compensating individuals where "the amounts at stake for individuals may be so small that separate suits would be impracticable," quoting 1966 Advisory Committee Notes).

The named Plaintiffs filed their motion for class certification on January 16, 2018. Dkt.#44. After briefing was completed, this Court denied the motion "without prejudice" to renewal on the basis that a decision on Plaintiffs' then-pending motion for leave to add an additional named representative for one subclass could "guide the Court's assessment–to the limited extent necessary at the class certification stage–of the employee benefits issue that lies at the intersection" of the motions for leave and for class certification. Dkt. #62 at 3. Ultimately, the Court denied the motion for leave, too, but it offered guidance about the "non-participating" service claim. Dkt. #64.

On January 31, 2020, the Plaintiffs renewed their motion for class certification; the briefing on that motion was completed just before the Covid-19 pandemic began. On

October 7, 2020, the Court denied the Plaintiffs' Renewed Motion for Class Certification

"WITHOUT PREJUDICE." Memorandum Opinion at 1, 10, 16; Order at 1 (emph. in

orig.). That disposition was "to permit Plaintiffs a final opportunity to amend their class

definition in accordance with this Memorandum Opinion." Opinion at 10. The Court did

this in recognition that the "fail-safe problem" that it identified "can and often should be

solved by refining the class definition rather than by flatly denying class certification on

that basis." *Id*. quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th

Cir. 2012). Because the Court "permit[ted] Plaintiffs a final opportunity to cure ..., the

Court, in the interest of judicial economy, ... also note[d] additional defects in Plaintiffs'

proposed subclasses" to address in any renewed motion.  *Id*. citing *Campbell v. Nat'l R.R.*

*Passenger Corp.*, 311 F.Supp.3d 281, 315 (D.D.C. 2014).The Court's 11/8/2020 Minute

Order directed that in the renewed briefing, the parties  "shall include all materials they

would like the Court to consider" and "may not incorporate by reference materials from

their prior briefs."

As described in the First and Second Amended Complaints and below, the

Plaintiffs are moving to certify a class consisting of any and all persons who:

     (a)     Are former or current employees of Hilton Worldwide, Inc. or Hilton Hotels
Corp., or the surviving spouses or beneficiaries of former Hilton employees;

     (b)     Submitted a claim for vested retirement benefits from Hilton under the claim
procedures ordered by the District Court and the Court of Appeals in *Kifafi,
et al., v. Hilton Hotels Retirement Plan, et al.*, C.A. 98-1517; and

     (c)     Have been denied vested rights to retirement benefits by the Hilton

Defendants':

(1)    Use of "fractional" years of vesting service under an "elapsed time" method to count periods of employment before 1976 with no resolution of whether the fractions constitute a "year of service" under ERISA;

(2)    Refusal to count "non-participating" service for vesting purposes, notwithstanding that the service was with a hotel property that Hilton operated under a management agreement, that the Hilton Defendants counted service at the same "Hilton Properties" in *Kifafi* and represented to this Court and the D.C. Circuit in *Kifafi* that Hilton had counted "non-participating" service with Hilton for vesting, and that the "records requested and received from Defendants do not identify any non-participating property that is also not a Related Company"; and

(3)    Denial of retroactive/back retirement benefit payments to heirs and estates on the basis that the claimants are "not the surviving spouse" of deceased vested participants.

As described below, this definition has been refined to avoid the "fail-safe" issue described below.

**Background**

This case was designated as a "related case" to *Kifafi, et al. v. Hilton Hotels Retirement Plan, et al.*, C.A. 98-1517 (D.D.C.), because it involves the "same subject matter" and the "same parties." As this Court knows, *Kifafi* was a nationwide class action addressing Hilton's failure to comply with ERISA's benefit accrual and vesting rules in determining retirement benefits for over 22,000 former and current employees. In *Kifafi,* this Court certified a "benefit-accrual class" in May 1999, 189 F.R.D. 174, 180 (D.D.C.), and certified "four portions of the service counting claim for class treatment." 228 F.R.D.

3

382, 389 (D.D.C. 2005).[1] This Court and the D.C. Circuit ruled that Hilton violated

ERISA's benefit accrual and vesting rules and ordered equitable relief to remedy those

violations. *See* Second Am. Cmplt. (Dkt.#50) ¶¶18-22. The equitable relief for the vesting

violations required Hilton to vest over 700 Hilton employees in accordance with the

Court's rulings, and to "fund and administer a claim procedure open to all participants

whose vesting status turns on nonparticipating service." 701 F.3d at 733; Second Am.

Cmplt. ¶¶24-26.

Class counsel were active in the Court-ordered vesting claim process. They retained

a class action administrator to conduct mailings to individuals who potentially were vested

based on the service shown in Hilton's records and shepherded the resulting claims

through that process. *Id*. at ¶¶30-32. As a result of these efforts, Class counsel collected

vesting claims for another 770 individuals and submitted those claims to Hilton's Plan

administrator. *Id*. at ¶32. Hilton granted 169 claims but denied 601 claims, stating in form

letters prepared by the outside law firm of Alston & Bird that "you do not meet the

minimum number of years of vesting service." *Id*. at ¶33.

Hilton subsequently reversed its denials for 62 individuals, *id*. at ¶36, but it

---

[1] These "four portions" included: "(1) Plaintiff's claim that Defendants failed to credit employees with years of union service for vesting purposes; (2) Plaintiff's claim that Defendants improperly used a 1000 hours service standard rather than an 870 hour service standard; (3) Plaintiff's claim that Defendants failed to credit leaves of absence; and (4) Plaintiff's claim that Defendants failed to count the year in which employees became participants in the retirement plan for vesting purposes." 228 F.R.D. at 389.

continued to deny Class counsel's appeals on behalf of 220 of the claimants, by declining

to vest them on the grounds identified in (c)(1) - (3) of the proposed class definition set out

above. During the relief stage of the *Kifafi* litigation, Class counsel asked this Court to rule

on the denials coming out of this vesting claim process. However, this Court ruled that its

supervisory jurisdiction had concluded, including over Hilton's "denial of vesting claims

submitted through the established claims process." Dkt.#434 (12/7/2015) in C.A. 98-1517,

at 7. This action was filed a proposed class action six months later.

Defendants have twice moved to dismiss Plaintiffs' Complaint in this case, first on

July 11, 2016, and then on September 1, 2016. The first motion was dismissed as moot

after Plaintiffs amended the Complaint pursuant to FRCP 15(a)(1). Dkt.#17. On August

18, 2017, this Court denied Defendants' second motion to dismiss Claims One and Two

but dismissed Claim Three "without prejudice." 263 F.Supp.3d 8; Dkt. #33. Plaintiffs

moved for leave to amend to reinstate Claim Three on November 8, 2017, and that motion

was granted under FRCP Rule 15(a)(2) on January 24, 2018. Dkt. #49.

After Plaintiffs filed their motion for class certification on January 16, 2018,

Defendants opposed the motion on the ground that Plaintiffs' claims did not satisfy Rule

23's commonality and typicality prerequisites. Dkt. #56. Plaintiffs replied t70o that

opposition, but concurrently moved for leave to add an additional named representative for

the second subclass. Plaintiffs' motion for leave was denied on March 31, 2019, Dkt.#64,

and a motion to reconsider was denied on December 17, 2019. Dkt.#70. The Court

rescheduled the motion for class certification for filing on January 31, 2020. As stated, that

motion was denied on October 7, 2020 "WITHOUT PREJUDICE" on October 7, 2020,

and this second renewed motion was scheduled.

**The Named Plaintiffs' Claims**

The three Plaintiffs are committed to serving in a representative capacity to

represent themselves and the proposed class of at least 220 individuals who have been

denied vested rights to retirement benefits by the Hilton Defendants. *See* Second Am.

Cmplt. ¶12; Ex. 13.

**Valerie R. White.** Valerie R. White was born and raised in Washington, D.C. and

resides on Decatur Street in Northeast DC. Ms. White began work for the Washington

Hilton on June 21, 1972, starting as a bus girl and becoming a waitress. Second Am.

Cmplt. ¶3; White Decl. ¶¶1-2. After an accident in June 1975, she was transferred to a

front desk cashier position. *Id*. She terminated employment with the Washington Hilton in

March 1982, and went on to work in accounting for the Hyatt Crystal City and later Hyatt

Arlington. White Decl. ¶3. Ms. White worked for the Hyatt Hotels for a total of 33 years,

retiring in 2015 at the age of 65. *Id*.

In October 2014, Ms. White completed her Hilton vesting claim form, and Class

counsel included it in the batch of claims submitted to Hilton in December 2014. But

rather than credit her with 10 years of service, which makes her vested under the

Retirement Plan as in effect before 1989,[2] Hilton credited Ms. White with 3.52957 years for her service from 6/21/1972-12/31/1975 plus 6 years for service from 1/1/1976 to 3/26/1982, for a total of 9.52957 years of vesting service. Hilton did not round up or otherwise apply ERISA's "hours of service" equivalencies to determine whether this fractional period constituted a "year of service" for vesting, but simply left Ms. White 0.47043 years short of ERISA's 10 year of service vesting requirement. Second Am. Cmplt. ¶44; Ex. 1. The Hilton Defendants denied her appeal and have denied altogether the appeals of at least 56 other class members with hanging fractional years–even though the application of ERISA's "hours of service" equivalencies to those periods clearly produces the critical year of service needed for vesting. Second Am. Cmplt. ¶41.

**Eva Juneau.** Eva Juneau, the second named Plaintiff, worked at the Reno Hilton as a showroom server from April 22, 1991 until May 16, 1996, and then as a banquet server and bartender at the Flamingo Hilton Reno from May 17, 1996 until November 10, 2000, often working six nights a week and holidays. Second Am. Cmplt. ¶4; Juneau Decl. ¶1. After the Flamingo Hilton became the Golden Phoenix Reno, Ms. Juneau continued working at that same hotel property until it closed in 2005. Juneau Decl. ¶2. She has since gone into construction management and currently manages a weed control company in Reno. *Id*.

Ms. Juneau submitted that she is entitled to be vested based on her service at the

---

[2] After 1988, ERISA §203(a) only required five years of service for vesting.

Reno Hilton and also entitled to be vested when her additional service with the Flamingo Hilton is counted. Second Am Cmplt. at ¶58, 70A. The Hilton Retirement Plan's records, however, only credited her Reno employment starting in August 1992 and stopped with the end of her employment at the Reno Hilton on May 16, 1996, with no credit for her service thereafter with the Flamingo Hilton until 2000. *Id*.

In October 2014, Ms. Juneau completed her vesting claim form under the process *Kifafi* mandated and she was included in the batch of claims Class counsel submitted in December 2014. However, despite Ms Juneau having worked for Hilton for over nine years, the Hilton Defendants counted only four years of service for vesting based on the period between August 1, 1992 and May 16, 1996 (refusing to credit her service before and after that for vesting). Second Am. Cmplt. ¶58; Ex. 2. This left her one year shy of the five years required for vesting under the ERISA vesting rules as in effect after 1988. Hilton refused to count her service before the August 1, 1992 date on which the Reno Hilton began participating in the Plan on the basis that "you were employed at a non-participating property ... [s]pecifically, Reno Hilton was a non-participating property prior to August 1, 1992." *Id*. ¶58, Dkt.#75-9. Hilton also refused to count any of Ms. Juneau's service with the Flamingo Hilton on the basis that "the Plan" did not have "actual hours records" for that employment. *Id.* ¶70A, Dkt.#75-9. While Hilton represented to the Court and Plaintiffs' counsel that it was "count[ing] any claimed vesting service" and vouched to claimants that it was "giving full credit for the additional or different dates of

employment identified on your claim form," Second Am. Cmplt. ¶¶72-73, Hilton refused to count Ms. Juneau's service with the Flamingo Hilton, telling Ms. Juneau that "we find there is currently insufficient evidence that you had service with Hilton during the additional dates identified in your appeal letter, and thus we find as a factual matter that this service should not be included in determining whether you are vested." *Id*. at ¶¶71-72. Ms. Juneau has multiple documents, including a scholarship awarded to her son in May 2000, showing her employment with the Flamingo Hilton past May 16, 1996. Ex. 3.

Altogether, Hilton has denied vesting claims for at least 135 class members by refusing to count "non-participating" service at Hilton Properties when credit for such service would result in vesting.

**Peter Betancourt.** Peter Betancourt, the third Plaintiff, is the son of Pedro Betancourt, a deceased Hilton employee who worked at the New York Hilton from October 3, 1947 to January 13, 1979 and died in 1985 at the age of 71. Second Am. Cmplt. ¶76. Pedro Betancourt started as a busboy and worked his way up to chief executive steward before he retired at 65. A Hilton Hotels newsletter features a photo of Pedro Betancourt and his wife Delia at his 1979 retirement party, which recognized that "he has been with Hilton for 32 years" and was "proclaimed ... the 'Steward of Stewards'" at the New York Hilton and "many Hilton properties" where he was sent by Hilton to "participat[e] in the opening." Ex. 5; Betancourt Decl. ¶4. Incredibly, despite his "32 years" of service with Hilton acknowledged in a Hilton newsletter, Hilton did not

vest Mr. Betancourt in his retirement benefits and he never received even one dollar of benefits from his retirement in 1979 until his death six years later in 1985. If Pedro Betancourt had been vested, as ERISA law requires, his wife, Delia, would also have received surviving spouse benefits from 1985 until her death at age 78 in 1998. Second Am. Cmplt. ¶77B. But like her husband, Delia never received any benefits from Hilton's Retirement Plan.

Peter Betancourt submitted a vesting claim form in October 2014 as his parents' sole heir and the executor of their estates. Second Am. Cmplt. at ¶76. Documents provided by Hilton show Hilton belatedly crediting Pedro Betancourt with 19 years of vesting service during the *Kifafi* vesting review, more than enough to be vested (though still far less than the "32 years" described in the Hilton Hotels newsletter). *Id.*; Ex. 4. However, Hilton still denied Peter Betancourt's vesting appeal, no longer on the basis that his father was not vested, but now on the basis that "you [Peter Betancourt] are not the surviving spouse of P. Betancourt," saying that "the Plan document does not provide for a death benefit to anyone other than a spouse." *Id*.

This Court initially dismissed Peter Betancourt's claim on the basis that the Complaint did not sufficiently allege how Pedro Betancourt had been part of a vesting subclass in *Kifafi*, or how Peter Betancourt was entitled to his father's benefits. 263 F.Supp.3d at 12. However, this Court granted Plaintiffs' motion for leave to amend under FRCP 15(a)(2) on 1/24/2018, on the basis that Plaintiffs "reasonably attempted to address

10

the reasons for which this Court initially dismissed Claim Three" and that the motion was "not the proper posture to resolve the[] disputes" about whether Pedro Betancourt "became 'newly vested' as a result of the vesting claim process ordered in the *Kifafi* litigation" or whether Peter Betancourt "qualif[ies] as a beneficiary entitled to any 'newly vested' benefits." Dkt. #49 at 2-3.

The Hilton Defendants have refused to pay the back benefits not only to Peter Betancourt, but to the estates of 28 other deceased participants on the basis that the claimants are "not the surviving spouse" of participants who were or should have been vested as a result of the *Kifafi* litigation–including under the vesting claim process mandated by that litigation.

## I.      This Action Satisfies the Rule 23(a) Requirements for Numerosity, Commonality, Typicality, and Adequate Representation.

"A plaintiff moving for class certification carries the burden of establishing all four prerequisites [in FRCP 23(a) of numerosity, commonality, typicality, and adequacy of representation] and courts may exercise broad discretion in determining whether they have been met." *Daskalea v. Wash. Humane Soc'y*, 275 F.R.D. 346, 372 (D.D.C. 2011).

The Court's Rule 23(a) analysis may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). But the mission at the Rule 23 stage is "not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). "Merits questions may be

considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *D.L. v. District of Columbia*, 713 F.3d 120, 125-26 (D.C. Cir. 2013). This Court's 9/28/2018 decision also recognizes that this Court's "assessment" of the employee benefits issues "at the class certification" is only "to the limited extent necessary" under Rule 23(a). Dkt. #62 at 3.

Because Plaintiffs satisfy all four of Rule 23(a)'s prerequisites, this Court should certify the claims of the proposed class to allow them to pursue remedies for the "service counting" violations resulting from Hilton's continuing disregard for ERISA's mandatory vesting standards, the regulations, the case law, including *Holt v. Winpisinger*, 811 F.2d 1532, 1537 (D.C. Cir. 1987), and this Court's determinations in *Kifafi* on issues related to vesting.

### A.    Defendants Do Not Contest that the Members of the Proposed Class Are So Numerous that Joinder Is Impracticable.

To satisfy the Rule 23(a)(1) requirement of numerosity, the Plaintiffs must show the proposed class "is so numerous that joinder of all numbers is impractical." "There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination requires examination of the specific facts of each case and imposes no absolute limitations." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). "[I]n most cases a class of at least forty members presumptively satisfies the impracticability of joinder requirement, though classes as small as twenty might be appropriate." *Barnes v. District of Columbia*, 242 F.R.D. 113,

121 (D.D.C. 2007). "[S]ubclasses may result in some that are too small to satisfy the

numerosity requirement." *Manual for Complex Litig., Fourth*, §21.23. But "when the

class is small, factors other than numbers are significant," including whether "putative

class members are geographically dispersed," "the size of the potential group of plaintiffs

and the inconvenience of litigation." *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246

F.R.D. 293, 306 (D.D.C. 2007) ("interest of judicial economy is clearly served by

resolving the complex common issues raised by the instant action in a single action, rather

than thirty individual actions").

Defendants' previous oppositions to class certification did not contest numerosity,

*see* Dkt.#56 at 9, Dkt.#75 at 8-9, and nothing has been disclosed that calls numerosity into

question. As the Complaint alleges, the proposed class includes at least 220 individuals

who have been identified by Class counsel. Second Am. Cmplt. ¶12.  Each of the

proposed subclasses equals at least twenty-eight class members, and two of the three far

exceed that number. Even if each class member lived in the District of Columbia, those

numbers make joinder impracticable and satisfy the numerosity requirement.[3]  Here, as

this Court found in *Kifafi*, the proposed "class members are dispersed throughout the

---

[3] Based on Defendants' Initial Disclosures and discussions with defense counsel,
Class counsel believe there are additional individuals who made vesting claims
independently of Class counsel's batched submissions who will be identified in merits
discovery, thereby adding to the 220 individuals currently identified. *See Barnes v.
District of Columbia*, 242 F.R.D. at 121 ("With a proposed class containing thirty-some
*identified* class members, with many others potentially waiting in the wings, it would be
impracticable to try the matter by joinder").

country," making joinder even more impracticable. 189 F.R.D. at 176.

**B.      Plaintiffs' Claims Present Common Questions of Law and Fact.**

Rule 23(a)(2)'s commonality requirement requires "questions of law or fact common to the class." "What matters to class certification, the [Supreme] Court said, is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350).

Commonality does not require that *every* issue be common to every member of the class. It only "requires that the court to determine whether there is at least one question of law or fact common to the class." *Moore v. Napolitano*, 926 F.Supp.2d 8, 29 (D.D.C. 2013). "[E]ven a single common question will do." *D.L. v. District of Columbia*, 713 F.3d at 129. "Factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members*." Id., accord, Barnes*, 242 F.R.D. at 122 ("Regardless of any minor factual variations that might distinguish one class member from the next, all members of each class will share those common questions").

This is again not a merits determination, but a determination of "whether the Rule 23 prerequisites for class certification are satisfied." *D.L., supra,* 713 F.3d at 125-26. As this Court ruled in certifying the vesting subclasses in *Kifafi*, Plaintiff's demonstrations that a "claim is sufficiently common" cannot, moreover, be overcome by "vague

statements [that] proof of one putative class member's entitlement to vesting service

depends on facts and circumstances unique to that individual." *Kifafi v. Hilton Hotels Ret.*

*Plan*, 228 F.R.D. 382, 388 (D.D.C. 2005).[4] Here, as in *Kifafi*, the commonality

requirement is met because each of the three proposed subclasses describe practices that

the named Plaintiffs and "other former employees" have in common.

###### 1.   Valerie White's Subclass Has Common Issues.

Valerie White's vesting claim presents the kind of hanging "fractional year" with

no application of ERISA's "hours of service" equivalencies to resolve whether the

fractional year should constitute a "year of service" under ERISA which this Court

***rejected*** in *Kifafi*. This Court rejected Hilton's use of the elapsed time method to credit

vesting service because "[it is] mathematically possible for an employee to have fewer

years of vesting service under the elapsed time method than under an hours standard."

616 F.Supp.2d at 34; Second Am. Cmplt. ¶¶42-43. In a later decision, the Court ordered

Hilton to "credit participants for service based on the hours reflected in the Plan records

and the proper equivalencies, not the elapsed time method." 736 F.Supp.2d at 82. Hilton's

consulting experts subsequently vested over 100 individuals in 2009-2011 when "hours

were used in place of elapsed time." Dkt.#219-9 (10/21/2009 Decl. of Ian Altman) at ¶53.

Hilton's experts stated that "to conform to the Court's [2009] ruling," "[i]t is appropriate

---

[4] *Compare Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307, 316 (D.D.C. 2018) (no
commonality if "Plaintiff's claims concern only the circumstances surrounding Plaintiff's
alleged termination").

to apply the equivalencies for counting service reflected in the amended Hilton Plan and award a year of vesting service for any year in which a participant worked for at least 870 hours (750 hours for salaried employees)." *Id*. at ¶60; *see also* Dkt.#240-3 (3/11/2011 Decl. of Constance Hiatt) at ¶11 ("As this Court found appropriate, participants should be given a year of vesting service using the 190 hours per month equivalency when the elapsed time method was used to credit vesting service"). The individuals vested as a result of the Court's ruling included Susan Doroba, who had 9.78763 years when an "elapsed time" method was applied that left a fraction for her employment before 1976, and James Larsen, who had 9.90823 years with the fraction left by applying an elapsed time method to his employment before 1976 with no application of ERISA's hours of service equivalencies. *Id*. at ¶50A.[5]

In this Court's August 22, 2017 decision denying Hilton's motion to dismiss in this case, this Court recognized that Hilton's practice of leaving fractional years hanging appears contrary to Department of Labor and Treasury regulations, which require "fractional years [as of December 31, 1975 to] be converted to an hourly amount." Dkt.#21 at 3 (citing 41 Fed. Reg. 56462 (1976), 29 C.F.R 2530.200b-3(b), and 26 C.F.R. 1.410(a)-7(f) and (g)). This Court observed that "how that decision was made [by Hilton],

---

[5] Ms. White was not included in this vested group because, at that time, Hilton was not crediting her with *any* years of vesting service before 1976, even though Hilton's "Calculator" records showed her "Svc Date" of "6/21/1972." It was only in 2015 that Hilton recognized that Ms. White had any vesting service before 1976. Ex. 1.

and on what basis," was "not available at this stage of the case," and left open only "the

possibility that the Plan's decision not to convert fractional years may have been

reasonable" on some other basis. Dkt.#21 at 3.

Hilton has identically and uniformly stated in its denial letters to Valerie White and

at least 56 other employees in her subclass who have fractional years of service before

1976 that:

> "a portion of your employment history with Hilton was prior to January 1,
> 1976. Prior to 1976, vesting credit is calculated using an elapsed time
> method. The elapsed time method calculates service by measuring the time,
> in years and fractional years, between the date you began employment and
> December 31, 1975. The amount of service credited does not depend on the
> hours worked during a time period, but rather depends on the years and
> fractions of years during which you were employed by Hilton prior to
> January 1, 1976."

Second Am. Cmplt. ¶41. Hilton is thus leaving fractional periods by applying elapsed

time to employment before 1976 without converting those periods to "years of service"

under ERISA, contrary to the Department of Labor and IRS regulations and contrary to

Hilton's experts' actions in conforming with this Court's prior decision on elapsed time in

*Kifafi*. Second Am. Cmplt. ¶¶42-43, 50-51.

By no stretch of the imagination is this across-the-board practice unique to Ms.

White. Indeed, a "List of key vesting rules" attached to a 7/14/2015 email from Hilton's

outside counsel at Alston & Bird to members of Hilton's "U.S. Appeals Committee,"

directs the Committee to use "elapsed time for service pre-1976 to determine vesting

credit," with no consideration for the regulations on converting fractional years to hours

17

of service. Ex. 6.  Individual worksheets produced by the Hilton Defendants with their

initial disclosures also state that "Service prior to 01/01/1976 is calculated based on

Elapsed time" and show participants with as much as 9.525, 9.60215, and 9.8018 years of

service who are still deemed "**Not Vested**" on this basis. Ex. 7. Minutes of a 6/15/2015

meeting of Hilton's U.S. Appeals Committee further confirm the common practice,

stating that the issue of whether these years should be "round[ed]-up" for "employees

who came very close to vesting" was rejected:

> During the course of the review, additional discussion focused on
> employees who came very close to vesting. For example, William Mendez
> had 9.96 Years of Vesting Service. A subcommittee member asked why
> such employees would not have worked just a little longer to become
> vested. Mr. Di Carlo [outside counsel from Alston & Bird] responded that
> such employees may not have realized how close they were to vesting. In
> reference to such employees, Mr. DiCarlo also raised the issue of whether it
> was appropriate to 'round-up' the Years of Vesting Service. After a full
> discussion of this topic, the Subcommittee members unanimously agreed
> that rounding-up would not be consistent with the terms of the Plan, which
> does not provide for rounding and requires a full five or ten years for
> vesting."

Ex. 8.  Defendants' rejection of the application of  "hours of service" equivalencies to

those fractions was thus reached with no consideration of the application of the DOL or

Treasury regulations, and with no consideration of this Court's August 22, 2017 decision

or even Hilton's own experts' actions in carrying out this Court's decisions in *Kifafi*.

### 2.      Eva Juneau's Subclass Has Common Issues.

For Eva Juneau and 134 other Hilton Retirement Plan participants, Hilton has

engaged in the common practice of not counting "non-participating" service for vesting

purposes. The denial letters the Hilton Defendants sent Eva Juneau and other individuals in this subclass under the vesting claim process said that:

> "Since you had service at a non-participating property that is not a Related Company or Participating Employer, you are not entitled to any vesting credit for such service."

Second Am. Cmplt. ¶58. In denying Hilton's September 2016 motion to dismiss, this Court recognized that a "portion of Ms. Juneau's employment was discounted for vesting purposes because Defendants determined she was employed at a 'non-participating property that is not a Related Company." Dkt. #21 at 4. The non-participating service subclass includes 29 class members whose claims to non-participating service were denied by Hilton, not using the language quoted above, but because the Plan did not have "actual hours records" for periods of service at non-participating properties or because the "Plan's records indicate that you had insufficient earnings" in periods of service at non-participating properties. Second Am. Complaint ¶¶67-73. As indicates, Ms. Juneau typifies both denials. Her service with the Reno Hilton before June 1992 was denied on the basis that the "Reno Hilton was a non-participating property prior to August 1, 1992," Dkt. #75-9 at 2, and her service in other years with the Flamingo Hilton was denied on the basis that the Plan's records had "insufficient hours.". *Id.* and Ex. 2. Even though Ms. Juneau produced documents showing that she received an instructional certificate in March 2000 and her son received a Flamingo Hilton Reno scholarship in May 2000, Hilton's Retirement Plan had no records of her non-participating hours/earnings with the

19

Flamingo Hilton after February 1997, Dkt. #74-9. The common issue is that both denials of vesting credit for Ms. Juneau were for periods of "non-participating" employment.

In the *Kifafi* litigation, this Court recognized that *Holt v. Winpisinger*, 811 F.2d 1532, 1537 (D.C. Cir. 1987), establishes this Circuit's precedent on counting union and other non-participating service for vesting. 616 F.Supp.2d at 12. *Holt* holds that under ERISA §203, 29 U.S.C. §1053, "[o]nce an employee participates in a pension plan, all of his or her years of service, whether completed before or after participation begins, count statutorily toward the ten years of vesting credit." 811 F.2d at 1537. To determine "all of an employee's years of service with the employer or employers," ERISA §3(5), 29 U.S.C. §1002(5), defines the "employer" as "any person acting directly as an employer or indirectly in the interest of an employer." This definition is identical to the FLSA definition of the "employer," which this Court ruled in *Melendez v. Poy Loung DC Grp, LLC*, 2018 U.S. Dist. LEXIS 165996, *10-11 (D.D.C. 9/27/18), is a "broad" definition based on "economic reality." In *Holt*, the years of service when an "independent contractor" employed Ms. Holt were required to count for vesting because the International Association of Machinists exercised "control" over her employment even when she was technically employed by an "independent contractor."

As in *Holt*, the Plaintiffs here will show that the "managed property" agreements that Hilton enters into with third-party owners or lessees give Hilton the power to "hire, promote, discharge and supervise the work of the executive staff of the hotel ... and will

supervise through said executive staff the hiring, promotion, discharge and work of all other operating and service employees of the Hotel." Ex. 12, Atlanta Hilton at 11 (Bates #0018152), and *see id.* Hilton Suites Garden Hills at 14 (#0018267), Hilton Suites Tapatio Hills at 15 (#0018347), Hilton Suites Oakbrook Terrace at 9 (#0018528), Hilton Suites Squaw Peak at 15 (#0018600). In other words, the managed property agreements give Hilton the power to "directly or indirectly" function as the "employer." The "separation of hotel ownership and hotel operations" with "asset-light" management agreements like these has been part of the "business model" for all of the major hotel chains for decades, with each chain "hav[ing] their own 'form' or template agreements" for the management contracts.[6] Hilton's 2018 10-K states, for instance, that "[o]ur core management services consist of operating hotels under management contracts for the benefit of third parties who either own or lease the hotels" and touts that "[t]hese contracts require little or no capital investment to initiate on our part and provide significant return on investment for us as fees are earned." *Id.* at 8.

Even before Congress enacted the same definition of the "employer" under ERISA in 1974, the Supreme Court addressed managed property agreements under the FLSA's definition in *Falk v. Brennan*, 414 U.S. 190, 195 (1973). It is an establish principle that it is "not only appropriate but also realistic to presume that Congress was thoroughly familiar with

---

[6] *See* DLA Piper, "Hotel Management Agreements: A multi-jurisdictional guide" (March 19, 2019), available online at https://www.dlapiper.com/en/us/insights/publications/2018/04/hotel-management-agreements-guide/

these unusually important precedents from this and other federal courts and that it expected its enactment to be interpreted in conformity with them." *Cannon v. University of Chicago*, 441 U.S. 677, 697-99 (1979).

In *Falk*, the Supreme Court addressed whether "maintenance workers employed at the buildings managed by [a real estate management company]" are "employees of the apartment owner or of the [real estate management company]" under the FLSA. 414 U.S. at 195.[7] The Court held that "[i]n view of the expansiveness of the Act's definition of 'employer' and the extent of [the management company's] managerial responsibilities at each of the buildings, which gave it substantial control of the terms and conditions of the work of these employees, [the management company] is, under the statutory definition, an 'employer' of the maintenance workers." *Id.* The Court ruled that it was "clear the maintenance workers are employees of the building owners. But we think that [the real estate management company] is also an "employer" of the maintenance workers under §3(d) of the Act [29 U.S.C. §203(d)], which defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Accord, Morrison v. Int'l Programs Consortium*, 253 F.3d 5, 10-11 (D.C. Cir, 2001) (looking at "economic reality" rather than "technical concepts" to determine employment status under

---

[7] *Accord, Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 520, 525 (1972) (real estate management company that managed eight commercial office properties and one apartment complex, including hiring, setting pay rates, and firing, subject to approval of the property owners, was the "employer," noting that thee definition is "broad enough" that there might be "simultaneous employers").

the FLSA); *Harris v. Medical Transport Mgmt.*, 300 F.Supp.3d 234, 240-46 (D.D.C.

2018) (denying motion to dismiss claim that agency was a "joint employer" with

transportation manager/"broker" when complaint sufficiently alleged indirect control over

drivers' work); *Ventura v. Bebo Foods, Inc*., 738 F.Supp.2d 1, 5 (D.D.C. 2010) (the

"economic reality test" may show "more than one 'employer'").[8]

Plaintiffs have not yet been permitted conduct merits discovery, but in the class

discovery, Hilton produced only the five management agreements referred to above, all of

which provide Hilton with the power, directly or indirectly, to "hire, promote, discharge

and supervise the work"  of the hotel property's executive, operating and service

employees, Ex. 12, thereby giving Hilton "substantial control of the terms and conditions

of the work of these employees."

Hilton's publicly-available 10-Ks provide further evidence of Hilton's "substantial

---

[8] The October 7, 2020 Memorandum Opinion says the legal theory about the "employer" as defined in ERISA was not spelled out  in the Complaint. *Id.* at 11. The Complaint cited ERISA §203(b)(1) and this Court's decisions in *Kifafi*, which relied on *Holt* as the controlling circuit precedent. Second Am. Cmplt. (Dkt.#50) ¶56, 59A. The only significant change has been the citation of legal authorities on the parallel definition of the "employer" in the FLSA. It is longstanding rule in this circuit that Plaintiffs are not required to plead legal theories. *Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. 1980); *accord*, *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023-24 (7th Cir. 2018), *cert. denied*, 139 S.Ct. 1465 (2019) ("It is immaterial that these legal theories were not spelled out in the initial complaint ... Rule 8 requires only that a complaint must set forth plausible facts that, if true, would support a claim for relief." "District courts may amend class definitions either on motion or on their own initiative"). Here, moreover, the focus on the "employer" came after the production by Defendants in class discovery of five of Hilton's hotel management contracts.

control" over employment at these properties. The 10-Ks do not contest Hilton's control or its legal consequences, but instead recognize that "[o]perators of hospitality properties" like Hilton "are subject to laws governing their relationship with employees, including minimum wage requirements, overtime, working conditions and work permit requirements." Ex. 13 at 10; *see also id*. at 29 ( hospitality companies are "subject to lawsuits, including class action lawsuits, alleging violations of federal laws and regulations regarding workplace and employment matters"). The 10-Ks also show that Hilton counts the employees who work in the managed properties as "our" employees, *i.e.*, "Our success depends in large part on our ability to attract, retain, train, manage and engage employees. We employ or manage more than 169,000 individuals at our managed, owned and leased hotels and corporate offices." *Id.* at 24.[9]

This Court has already separately ruled that Plaintiffs have "pleaded sufficient factual matter to stake out a plausible claim under Rule 12(b)(6)" that Eva Juneau should be vested based on the allegations that (i) the Hilton Defendants "made inconsistent determinations [in *Kifafi*] regarding vesting credit for non-participating properties" and that (ii) "records requested and received from [the Hilton] Defendants do not identify any non-participating property that is also not a Related Company." Dkt. #21 at 4*;* Second

---

[9] Pursuant to Section 302 of the Sarbanes-Oxley Act, the CEO and CFO of Hilton Worldwide have certified that this 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

Am. Cmplt. (Dkt.#50) ¶¶61-62, 65-66. Under the Department of Labor's claim procedure regulations and hours of service rules, fiduciaries are required to keep records "to determine hours of service" and to apply plan provisions "consistently with respect to similarly situated claimants." 29 C.F.R. 2530.200b-3(a) and (b); 29 C.F.R. 2560.503-1(b)(5).

In the *Kifafi* litigation, the Hilton Defendants moved in December 1999 to modify the class definition (with no reference what was or was not in the Plan's records) to include only the "current or former employees of Hilton Corp. or a Related Company" where Hilton had an "80% or more ownership interest" and to exclude "[h]otels managed by Hilton Corp." "which are not owned or controlled by Hilton Corp." Dkt.#69 in 98-1517, at 7, 9, 11. This Court denied that motion because it sought "to ensure that [the class definition] did not include the managed properties," concluding that "the plain language of the class definition clearly supports Plaintiff's interpretation, under which the employees of the managed properties are part of the class." Dkt.#88 in 98-1517, at 2, 4.

Discovery in the *Kifafi* litigation therafter unearthed evidence that "[f]or as far back as we can go, no one [at Hilton] kept track of the non-participating properties' employees (hours/earnings) to give them vesting." 616 F.Supp.2d at 19 (quoting 5/6/2002 email from benefits administrator). Under this Court's remedial directions, Hilton's consulting experts counted years of service for vesting at the Reno Hilton and 12 other non-participating properties – including properties for which Hilton now refuses to credit

25

vesting under the vesting claim process ordered in *Kifafi*. *See* Dkt.#219-9 (10/21/2009 Ian Altman Decl.) at ¶¶37-38; Dkt.#240-3 (3/11/2011 Constance Hiatt Decl.) at ¶16; Second Am. Cmplt. (Dkt.#50) ¶65. Hilton not only credited such service in *Kifafi*, but it made unqualified representations to this Court and the Circuit that it had turned the corner and was crediting "employment with a property that is not participating in the Plan" for vesting. Hilton's October 2009 brief on equitable relief in *Kifafi* thus represented that "The Plan ... credits ... non-participating employment (primarily union employment and employment with a property not participating in the Plan) for vesting service." Dkt.#219 at 21. Hilton made the same representation to the Circuit. See 7/3/2012 Appellees Br. in C.A. 11-7113, at 49 ("The Plan provides that non-participating service – which primarily is employment in a unionized position (i.e., union service) or with a Hilton property that does not participate in the Plan ... does count for vesting in the Plan"). There were no qualifications in these representations based on any factual variations related to particular non-participating properties.

To nail down the basis for Hilton's denials, the *White* Plaintiffs requested that Hilton produce any list that Hilton has of non-participating properties that are or are not "Related Companies." Second Am. Cmplt. (Dkt.#50) at ¶¶60-62. Hilton produced only the very same list of participating and non-participating properties that had been produced in *Kifafi* in 2005. Hilton *never* produced a list of which non-participating properties were "Related Companies" and at what times they were "Related." As this Court recognized,

26

the "records requested and received from Defendants do not identify any non-participating property that is also not a Related Company." Dkt. #21 at 4. A "[l]ist of key vesting rules" prepared by the law firm of Alston & Bird for the Hilton Appeals Committee reveals that for these claims, the basis for the denials was the same as it had been at the start of *Kifafi* litigation: The Committee was flatly instructed that:  "Service at non-participating properties does not count for vesting purposes." Ex. 6 (at 1276).

Despite the Court's finding that Hilton had not "kept track of the non-participating properties' employees (hours/earnings) to give them vesting," Hilton is audaciously denying claimants' additional years of service for non-participating service precisely because the Plan did not keep such records. Thus, Hilton denied Ms. Juneau's claim to non-participating service with the Flamingo Hilton from February 1997 to November 2000, on the basis that "the Plan" lacked "actual hours records." Dkt.#75-9 at 2. The October 7, 2020 Memorandum Opinion criticized the part of this subclass that covers the 29 class members where Hilton said it lacked "actual hours records" or that the "Plan's records indicate that you had insufficient earnings" as "fold[ing] a unique ERISA issue into the non-participating service subclass." Mem. Op. at 13. To better explain Plaintiffs' position, the common issue among everyone in this subclass, including those 29 individuals, is that "non-participating" employment has not been counted for vesting. For some of those persons, Hilton framed the denial as that they were not entitled because they had "service at a non-participating property that is not a Related Company or

27

Participating Employer." For others, Hilton framed the denial as an absence of "actual hours records" or that the "Plan's records indicate ... insufficient earnings," which is circular because Hilton had not "kept track of the non-participating properties' employees (hours/earnings) to give them vesting." The legal issue and relief for the members of the subclass are the same because they are not being credited with "non-participating" employment under slightly different phrasing.[10]

### 3.    Peter Betancourt's Subclass Has Common Issues.

Defendants' denial of retroactive/back benefits to heirs and estates other than "the surviving spouse" is also a common issue shared by the subclass headed by Peter Betancourt. Paying "arrearages" in pension benefits to surviving beneficiaries is not something that arrived with ERISA in 1974. Over 160 years ago, the Supreme Court recognized this duty in *Walton v. Cotton*, 60 U.S. 355, 358 (1857): "Under the construction given by the [Pension] Department, if a male pensioner dies, leaving no widow or children, but grandchildren, the pension cannot be drawn from the Treasury." The Court determined that this construction "stop[ped] short of carrying out the humane motive of Congress," and ordered payment of the "arrearages" among her living children and orphaned grandchildren.

---

[10] If there was a need to, this issue could be broken out as a fourth subclass with Ms. Juneau as the named plaintiff for both. But there is no need to do that because of the common issues and common subclass leadership and because the proposed order already sets out the two parts to the Juneau subclass.

This Court's orders in Kifafi also required payment of such arrearages to heirs and estates when there was no "surviving spouse.." Under the August 31, 2011 Order in *Kifafi*, "[b]ack payments for deceased participants shall be made in a manner that is consistent with §4.13(e)(6) of the 2007 Plan, which provides that any additional benefits payable to the participant shall be payable to the surviving beneficiary or beneficiaries, if any, under the optional form of benefit, if any, elected by the participant, or, if there is no such surviving beneficiary, to the participant's surviving spouse or, if there is no surviving beneficiary or surviving spouse, to the participant's estate." Dkt.#358 at 10.

In conformity with this Court's Order and §4.13(e)(6) of the Plan, Hilton made retroactive payments to the non-spousal heirs of deceased class members who are legally indistinguishable from Peter Betancourt. For instance, Leonard Walch, Jr. passed away at the age of 73 without ever receiving a retirement benefit because Hilton unlawfully classified him as "Not Vested." As a result of *Kifafi*, Mr. Walch was reclassified as "newly vested," and Hilton paid his son and heir, Leonard Walch, III, the back payments of the original retirement benefits due plus the "true up" increase due from the benefit accrual violations for the period until Leonard Walch, Jr.'s death. Second Am. Cmplt. (Dkt.#50) ¶81.

A Flowchart that Hilton's outside counsel prepared for the Committee in 2016, after this lawsuit began, portended no issues with these payments, admitting that retroactive (i.e., back) benefits are payable to the participant's estate. Dkt. #37-1 at 2. But

29

Hilton's denial letters to Mr. Betancourt and 28 other individuals nevertheless have identically denied the payment of benefits on the ground that the claimant was "not the surviving spouse of" the participant. Second Am. Cmplt. (Dkt.#50) ¶¶75-76.

Class counsel submit that the payments to Mr. Betancourt of the back benefits due both his parents from his father's vested right are required by this Court's rulings in *Kifafi* and also by the retroactive payment provisions of Hilton's Plan, ERISA's fiduciary duties and nonforfeiture rules, and this Court's authority to award "appropriate equitable relief" under ERISA §502(a)(3), 29 U.S.C. §1132(a)(3). *See* Second Am. Cmplt. (Dkt.#50) ¶¶77C-77F; *Contilli v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 2009) (forfeiture includes not paying back benefits to vested participant's estate "for months that have been lost").

In granting Plaintiffs' motion for leave to amend, this Court recognized that Plaintiffs allege that Pedro Betancourt "became "newly vested" as a result of the vesting claim process ordered in the *Kifafi* litigation, such that Pedro Betancourt allegedly now would be entitled to benefits" and that Peter Betancourt "qualif[ies] as a beneficiary entitled to any "newly vested" benefits owed to his father under *Kifafi*." Dkt.#49 at 2. Hilton had previously classified Pedro Betancourt as "Never Vested" because Hilton's "Calculator" records showed his "Start Date" for participation in the Plan as June 26, 1973, even though the same records showed his "Svc Date" as October 3, 1943. Second Am. Cmplt. (Dkt.#50) ¶76A; Ex. 4.

30

As a result of the *Kifafi* vesting claims process, Hilton recategorized participants like Pedro Betancourt from "Terminated Not Vested" to "Vested" in 2015. Ex. 3. But after recategorizing participants as "Vested" and paying some heirs like Mr. Walch, Defendants developed an additional reason not to pay the past due retirement benefits to heirs and estates. "Analysis Spreadsheets" produced in Defendants' Initial Disclosures show a column named "Additional defenses related to deceased participants" with a flag to mark vesting claims as "Deceased - claimant is not the surviving spouse." Ex. 10. Defendants' position is so contrived that Defendants had to disavow the contemporaneous "Flowchart for Remedy Benefits Payable to Deceased Participants," included in the same Initial Disclosures, that provides that retroactive benefits due the deceased participant are payable "to the participant's estate" and that retroactive benefits due a surviving spouse who is now deceased are payable to the "spouse's estate." Ex. 11.

### C.      The Named Plaintiffs' Claims Are Typical.

The typicality requirement in Rule 23(a)(3) "asks whether the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of the class." *Healthy Futures of Texas v. Dept. of Health and Human Services*, 326 F.R.D. 1, 7 (D.D.C. 2018); *see also  O.A. v. Trump*, 404 F. Supp. 3d 109, 156 (D.D.C. 2019) ("Commonality is satisfied where there is a uniform policy or practice that affects all class members, and that principle applies with equal force to the typicality requirement").

31

The typicality requirement is satisfied if "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Healthy Futures of Texas*, 326 F.R.D. at 7.

"The typicality requirement is liberally construed." *In re McCormick & Co.*, 2019 U.S. Dist. LEXIS 114583, *70 (D.D.C. 7/10/2019). "Like commonality, typicality is not destroyed simply because there are some factual variations between claims of the representatives and other class members." *Barnes*, *supra*, 242 F.R.D. at 122. "[R]ather, typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Hoyte v. D.C.*, 325 F.R.D. 485, 490 (D.D.C. 2017); *accord*, *Disability Rights Council v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 28 (D.D.C. 2006).

In this case, the claims of Valerie White, Eva Juneau, and Peter Betancourt are typical of the proposed class and the proposed subclasses because, as described above, the Hilton Defendants have applied common practices to deny vesting claims and have used identically-worded grounds to deny their vesting claims. The named Plaintiffs' injuries "are identical to any injury suffered by the absentee class members, therefore their interests will be properly aligned." *Kifafi*, 189 F.R.D. at 177. Although the hotel and the length of employment may vary from class member to class member, this does not destroy typicality: a plaintiff's claim may differ factually and still be "typical" of the claims of

class members where "the legal theories are all fundamentally the same." *Disability Rights Council v. Washington Metro. Area Transit Auth*, 239 F.R.D. at 28.

In the 2018 class certification briefing, Defendants challenged Ms. Juneau's typicality because she worked at the Reno Hilton, which "was not a Hilton Property prior to August 1, 1992." Dkt.#56 at 18. The Defendants, however, denied the claims of Ms. Juneau and each of the other 106 "non-participating" subclass members on the basis that "[s]ince you had service at a non-participating property that is not a Related Company or Participating Employer, you are not entitled to any vesting credit for such service." Second Am. Cmplt. (Dkt.#50) ¶58. There was nothing unique about the "Reno Hilton" in that denial. Instead, Hilton simply told Ms. Juneau that "Reno Hilton was a non-participating property prior to August 1, 1992." Dkt. #75-9 at 2. A "List of key vesting rules" attached to a 7/14/2015 email from Hilton's outside counsel to members of Hilton's "Appeals Committee" also shows that in reviewing the vesting claims, Hilton simply applied the "general rule" that "Service at non-participating properties does not count for vesting purposes." Ex. 6 (at 1276). Ms. Juneau's claim is typical of that common claim because it is likely "to generate common answers apt to drive the resolution of the litigation."[11]

---

[11] As Plaintiffs offered before, Plaintiffs could add an additional named plaintiff from another Hilton Property that was non-participating. *See, e.g., Manual for Complex Litig. (4th ed.)*, §21.26 (court can conditionally certify class and "allow class counsel time to make reasonable efforts to recruit and identify a new representative who meets the Rule 23(a) requirements"). The test for typicality is not, however, whether the named

The Court's October 7, 2020 Memorandum Opinion also challenged Peter Betancourt typicality. The Betancourt subclass covers estates and heirs who are due back benefits. In *Kifafi*, this Court ordered Hilton to pay back benefits, but at some point during the implementation Hilton stopped doing this for the heirs and estates of participants like Mr. Betancourt's father who were newly vested as a result of *Kifafi*.

More recently, Hilton has emphasized that it is asserting a statute of limitations defense. Peter Betancourt's typicality is not upended because of a limitations defense "unless it will skew the focus of the litigation and create a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Meijer, Inc., supra*, 246 F.R.D. at 302. Here none of those conditions applies. Defendants' denial letter asserts that Peter Betancourt's father's "claim (if any) accrued, at the latest, on the later of what would have been P. Betancourt's Normal Retirement Date (generally, age 65) or P. Betancourt's date of death." Dkt.#75-13. Altogether, Hilton uses this identical language, except for changing the name) in 14 of the 29 denial letters to participants in this subclass. Pienta Decl. ¶14. There is no assertion in any of the denial letters of how Hilton "made known" its repudiation of their rights at the "later of" age 65 or the date of death, or how any of the now-deceased participants otherwise had "actual

---

Plaintiff for a subclass is factually identical to every member of the subclass because "even a single common question will do," *D.L. v. District of Columbia, supra*, 713 F.3d at 129, and "that principle applies with equal force to the typicality requirement." *O.A. v. Trump, supra*, 404 F. Supp. 3d at 156.

knowledge" of those denials to start a limitations period.

The Supreme Court's February 26, 2020 decision in *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S.Ct. 768 (2/26/2020),  which Plaintiffs brought to the Court's attention in a 3/3/2020 Notice of Supplemental Authority, shows that Defendants' limitations defense is baseless. In *Sulyma*, the Supreme Court held unanimously, in an opinion by Justice Alito, that the "actual knowledge" requirement to trigger the statute of limitations under ERISA §413, 29 U.S.C. §1113, "mean[s] what it says": "to have 'actual knowledge' of a piece of information, one must in fact be aware of it." 140 S.Ct. at 775-76. "[P]laintiff's knowledge must be more than 'potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal.'" *Id*. As a result, the "actual knowledge" limitations period "begins only when a plaintiff actually aware of the relevant facts, not when he should be." *Id*. at 778. In a response to the notice of supplemental authority, Defendants tried to distinguish this Circuit's 2012 ruling in *Kifafi* on "clear repudiation" by saying *Sulyma* "has no bearing" on it. Dkt.#;78 at 2. But as *Kifafi* ruled that "the requirement that the repudiation be clear and made known to the plan beneficiaries is not an idle one," 701 F.3d 718, 729, *Sulyma* ruled that "actual knowledge" is not what someone "should" have known.

Here, the Hilton Plan denied Peter Betancourt's father vesting credit without ever informing him, his wife, or his son of that denial, and also without ever informing them of the Plan's reversal and grant of that credit in the remedy phase of the *Kifafi* litigation. So

Peter Betancourt's father had no "actual knowledge" and there was no "clear repudiation."[12]

The impediment to typicality that this Court's Memorandum Opinion described appears to rest on the Plaintiffs' statement that Hilton's refusal to pay back benefits to non-spousal heirs was the "sole basis" for the denial when Defendants actually also asserted this limitations defense. Mem. Op. at 14-16. When Plaintiffs' counsel said "sole basis," they meant on the merits, and not an affirmative limitations defense that lacks any basis or chance of success. To clarify, Plaintiffs have changed "on the sole basis" to "on the basis."

The test related to typicality, as stated in *Meijer*, is whether Hilton Defendants have a "unique" defense to Peter Betancourt's claim that will "skew the focus" of his representation of the subclass. Plaintiffs respectfully submit that do not, particularly when the Supreme Court has ruled that ERISA's limitation defense is based on "actual knowledge," not what someone "should be" aware of according to the defendant.

---

[12] Defendants alternatively suggest that Peter Betancourt's father should have filed suit within three years of reaching "the age of 70.5." *See* Mem. Op. at 16. Since Mr. Betancourt lived to be 71, putting age 70.5 into the mix actually adds nothing to Hilton's formulation that he should have filed suit by the "later of" age 65 or his date of death. In any event, there is no exception in the *Sulyma* decision or in *Kifafi* for what someone (from Defendants' self-interested position) "should be" aware of on reaching age "70.5" any more than there is an exception for what they "should be" aware at age 65 or at the date of their death. Tellingly, Defendants's final denial of Peter Betancourt's appeal dropped any reference to "age 70.5." *Compare* Dkt.#75-11 with #75-13.

**D.     Defendants Do Not Contest That the Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**.

The fair and adequate representation prong of Rule 23(a)(4) has two components: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575 (D.D.C. 1997). "This is not a stringent requirement, as a conflict must be fundamental and go to the heart of the litigation in order to preclude certification." *Hoyte*, 325 F.R.D. at 491.

Defendants' previous opposition to class certification did not contest adequate representation. The three named Plaintiffs are committed to representing the class, not only themselves, and have signed agreements reflecting those responsibilities (which were produced to Defendants with the Initial Disclosures). *See* Ex. 13. There is no conflict of interest between the named Plaintiffs and the members of the proposed class. As described above, the named Plaintiffs share the class' interest in ensuring that their retirement benefits are vested. Thus, the Plaintiffs' interests are aligned with the interests of the other members of the class. The three named Plaintiffs are also very capable of serving as class representatives. In addition to her ten years of service with Hilton, Valerie White has over 30 years experience in accounting for the Hyatt and Hilton hotels. White Decl. ¶3. Eva Juneau has experience managing small businesses in Nevada. Juneau Decl. ¶2. Peter Betancourt owns his own business in the Miami area based on his work as

37

a singer/songwriter and acoustic guitarist. Betancourt Decl. ¶1.

Plaintiffs' attorneys are experienced litigators, well-qualified to represent the class, as this Court already determined in certifying the *Kifafi* class. 189 F.R.D. at 177. In the 2013 decision in *Kifafi* on fees, this Court recognized that lead counsel, Stephen Bruce, "is a leading lawyer in the field of ERISA litigation" and "authored one of the primary texts on pension claims under ERISA, which the Supreme Court and five circuits have cited." *Kifafi*, 999 F. Supp. 2d at 101-102. Ms. Pienta is also a "highly seasoned attorney[] in ERISA litigation." *Id*. at 102.[13] Mr. Bruce and Ms. Pienta represented the class in the *Amara v. Cigna Corp.* litigation which went to the Supreme Court and has been recognized by the U.S. Department of Labor as effecting a "sea change" in remedies for current and former employees under ERISA. Dkt. #319-1 in C.A. 01-2361 (D.Conn.), at 25. Mr. Bruce also represented two large classes prior to *Kifafi*, including *Page/Collins v. PBGC* in this District (C.A. 88-3406, 89-2997) which "beyond anyone's expectations" recovered "over $1 billion" in retirement benefits. *Collins v. PBGC*, 881 F.3d 69, 70 (D.C. Cir. 2018).

## II.     The Proposed Class Should Be Certified Under Rule 23(b)(2).

In addition to evaluating satisfaction of the FRCP 23(a) requirements, this Court

---

[13] Currently, except for revising her declaration, Ms. Pienta has been on family and personal leave to assist her children with schooling during the pandemic and start a business venture. If she does not return by the time discovery begins, co-counsel or an experienced associate will be retained.

must determine whether the proposed class fits within one or more of the subcategories of FRCP 23(b). Plaintiffs seek certification under Rule 23(b)(2), which authorizes class certification where a defendant is alleged to have "acted or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This Rule applies "when a single injunction or declaratory judgment would provide relief to each member of the class." *Nio v. United States Dep't of Homeland Sec.*, 323 F.R.D. 28, 34-35 (D.D.C. 2017) ("plaintiffs are only challenging the application of standardized policies that generally apply to the class"; "[e]njoining these broad policies or declaring them unlawful is appropriate relief under Rule 23(b)(2)").

This Court certified both the *Kifafi* benefit accrual and vesting classes under Rule 23(b)(2), finding that "Rule 23(b)(2) is the most suitable form for this class" because Defendants' practices were "applicable across the board to all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." 189 F.R.D. at 177; *see also* 228 F.R.D. at 385. And this Court ultimately ordered final injunctive relief to remedy Hilton's systematic violations of ERISA's vesting rules. 736 F. Supp. 2d at 76-83. On appeal, the D.C. Circuit followed *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), in holding that "Once the court determined the Plan violated ERISA, it entered the world of equity." 701 F.3d 718, 726 (D.C. Cir. 2012).

As in *Kifafi* and *Amara*, a Rule 23(b)(2) class is appropriate here because there is no dispute that the Hilton Defendants have acted or refused to act on grounds generally applicable to class members, and Plaintiffs are requesting that this Court order appropriate equitable and remedial relief to enjoin and provide redress for Defendants' violations of ERISA's vesting standards. The class-wide resolution under FRCP 23(b)(2) of Hilton's practices of failing to vest claims is the most efficient use of judicial resources and allows for consistent determinations for all similarly-situated individuals.

While it may be unnecessary, Plaintiffs alternatively request certification under Rule 23(b)(3), which provides a basis for class certification when questions of law or fact common to members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for adjudicating the controversy. Here, common issues predominate over uncommon ones. As explained above, the Hilton Defendants' practices of leaving "fractional" years hanging, not counting years of "nonparticipating" service for vesting in conformity with ERISA's broad definition of the "employer" and consistent with its actions in *Kifafi*, as well as not paying retroactive/back benefits to the estates and heirs of deceased participants, have been uniformly applied to the members of the proposed class to deny their rights. Class-wide resolutions of whether Hilton's practices are unlawful will adjudicate all class members' claims. *See In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 262 (D.D.C. 2002) ("predominance is met when there exists generalized evidence which proves or disproves

40

an element on a simultaneous, class-wide basis").[14]

### III.   Plaintiffs' Counsel Should be Appointed as Class Counsel.

Fed. R. Civ. P. 23(g)(1) requires that the Court appoint class counsel, based on consideration of: "(I) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class."

As described before, before bringing this action, Class counsel investigated Plaintiffs' claims thoroughly and committed significant resources to helping class members with their claims.  As for experience and knowledge, Plaintiffs' counsel are highly experienced in ERISA class actions, and uniquely knowledgeable about the applicable facts and law in this case after serving as Class counsel in the *Kifafi* litigation. No other counsel has this experience or is prepared to invest the resources and time necessary to ensure that Hilton complies with the law and pays the vested retirement benefits earned by these class members.

### IV.   The Class Definition and Description of Class Claims Satisfy the Requirements of FRCP 23(c)(1)(B).

To satisfy FRCP 23(c)(1)(B), the Order certifying the class must define the class in

---

[14] Superiority is also satisfied. *See, e.g., Barnes*, 242 F.R.D. at 123-24 ("In cases ... involving many extremely similar claims against the same defendant, class certification promises greater efficiency and consistency than serial litigation").

a manner that is "precise, objective, and [presently] ascertainable" and describe the class

claims or issues. *Manual for Complex Litigation, Fourth,* §21.222;  *In re Rail Freight*

*Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 30 (D.D.C. 2012) ("plaintiffs' proposed

class [must be] defined so as to establish that the general outlines of the membership of

the class are determinable at the outset of the litigation). Even though notice is not

generally required for Rule 23(b)(2) classes, Plaintiffs' proposed classes contain

"objective criteria" from which class membership can be ascertained. *Young v.*

*Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538-39 (6th Cir. 2012); *Byrd v. Aaron's Inc.*,

784 F.3d 154, 165 (3d Cir. 2015); *MCL, Fourth,* §21.222.

The issue the Court's October 7, 2020 Memorandum Opinion had with the class

definition proposed on January 31, 2020 was the reference to all persons who  "[h]ave

vested rights to retirement benefits that have been denied .... " Mem. Op. at 6-10. The

Court describes this as a "fail-safe" class. As Plaintiffs' previous Reply said (dkt. #76 at

24), Plaintiffs did not intend for this clause to be read without reference to the "objective

criteria" that follow it. But to be clear, they have refined the definition to say "[h]ave been

denied vested rights to retirement benefits ....' The definition of the "non-participating"

service class has also been refined to address the Court's separate criticism of it. *See*

Mem. Op. at 14.[15]

---

[15] Although the cases the Court cites do not address this point, it is not clear that
the "fail-safe" objection applies to proposed Rule 23(b)(2) class definitions when notice
is not required and the proposed definition provides "objective criteria." The *Manual for*

**Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the renewed motion for class certification.

DATED: November 20, 2020

/s/ Stephen R. Bruce
Stephen R. Bruce (D.C. Bar No. 289066)
Allison C. Pienta (D.C. Bar No. 494372)
STEPHEN R. BRUCE LAW OFFICES
1667 K Street, N.W., Suite 410
Washington, D.C. 20006
(202) 289-1117
stephen.bruce@prodigy.net
acaalim@verizon.net

Attorneys for Plaintiffs and Plaintiff Class

---

*Complex Litigation* points out that "Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not." *MCL, Fourth*, §21.222.